# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2024-CA-01034-SCT

*JAMES H. SECRIST AND DAWN SECRIST*

*v.*

*RUSH MEDICAL FOUNDATION D/B/A RUSH MEDICAL GROUP, P.A., D/B/A OCSHNER RUSH, RUSH MEDICAL GROUP, P.A., CARDIOVASCULAR INSTITUTE OF THE SOUTH, ANDREW GOWDEY, M.D., PATRICK KIRKLAND, M.D., AND BRET BOES, M.D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/28/2024 |
| TRIAL JUDGE: | HON. ROBERT THOMAS BAILEY |
| TRIAL COURT ATTORNEYS: | WILLIAM T. MAY |
| | J. RICHARD BARRY |
| | JOHN H. COCKE |
| | RIMEN BRAR SINGH |
| | ROBERT ALEXANDER CARSON, III |
| | CECIL MAISON HEIDELBERG |
| | JOHN G. WHEELER |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | CHARLES M. MERKEL, JR. |
| | ROBERT ALEXANDER CARSON, III |
| ATTORNEYS FOR APPELLEES: | CECIL MAISON HEIDELBERG |
| | JOHN G. WHEELER |
| | TRESA BARKSDALE PATTERSON |
| | MICHAEL D. CHASE |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 03/26/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., ISHEE AND GRIFFIS, JJ.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1. James and Dawn Secrist (collectively, "Plaintiffs") appeal the trial court's dismissal of their medical-malpractice complaint. Because Rush Medical Foundation d/b/a Rush

Medical Group, P.A., d/b/a Ocshner Rush, Rush Medical Group, P.A., Cardiovascular Institute of the South, Andrew Gowdey, M.D., Patrick Kirkland, M.D., and Bret Boes, M.D. (collectively, "Defendants"), are immune from liability, the trial court's orders of dismissal are affirmed.

## FACTS AND PROCEDURAL HISTORY

¶2. Governor Tate Reeves initiated a COVID-19 state of emergency on March 4, 2020. Exec. Order No. 1457, *Mississippi Coronavirus (COVID-19) Preparedness and Response Planning Steering Committee* (Mar. 4, 2020),
https://www.sos.ms.gov/content/executive%20orders/1457.pdf (last visited Feb. 23, 2026). Effective March 14, 2020, the Legislature passed Mississippi Code Section 11-71-7, which provided legal immunity for healthcare professionals or facilities for healthcare services performed during the COVID-19 state of emergency. Miss. Code Ann. § 11-71-7 (Supp. 2025). The COVID-19 state of emergency was terminated effective November 20, 2021. *Id.*

¶3. Plaintiffs filed a complaint against Defendants alleging medical malpractice for healthcare services performed between March to June 2021. According to the complaint, on March 2, 2021, James, who "had just recovered from COVID-19," was experiencing weakness in his legs and an inability to urinate. James was initially seen by Dr. Kirkland, an emergency medical doctor, at Rush Medical Foundation. James was later seen at Rush Medical Foundation by Dr. Boes, an emergency medical doctor, and Dr. Gowdey, a urologist. On May 20, 2021, James was seen by a healthcare provider at Cardiovascular Institute of the

South, who noted complaints of both upper- and lower-extremity weakness. In June 2021,

James was transferred to Anderson Regional Medical Center, "where he was ultimately

diagnosed with transverse myelitis caused by COVID-19."[1]

¶4.     In their complaint, Plaintiffs alleged the following medical negligence:

> The Defendant Rush Medical Foundation is liable for the failure of its
> emergency room personnel, including the Defendants Kirkland and Boes to
> adequately examine [James] and to realize he was having significant
> neurological symptoms that required a complete workup including but not
> limited to xrays, CT scans and MRIs of his spine and/or in failing to consult
> a neurologist and even in failing to inform [James] that he needed to go to a
> neurologist. The Defendants Kirkland and Boes are responsible for their
> negligence as aforesaid.

> The Defendant Rush Medical Group is liable for the negligence of the
> Defendant Gowdey who was negligent in failing to realize that [James] had a
> neurogenic bladder and other neurological symptoms in a timely manner and
> in failing to tell him to go to the Anderson Hospital Emergency room since
> Anderson had a neurologist on staff.

> The Defendant Cardiovascular Institute of the South is liable for the .
> . . fail[ure] to make sure [James] saw a neurologist in an urgent manner and/or
> in failing to send him to the Anderson Hospital Emergency room where there
> is a neurologist on staff.

Plaintiffs sought damages for James's pain and suffering, his loss of enjoyment of life, his

medical bills, and his lost wages, and Dawn's loss of consortium of James.

¶5.     Defendants filed a motion to dismiss claiming immunity under Section 11-71-7.[2] The

---

[1] "Transverse myelitis is a neurological disorder caused by inflammation of the spinal cord." *Transverse Myelitis*, Nat'l Inst. of Neurological Disorders & Stroke, https://www.ninds.nih.gov/health-information/disorders/transverse-myelitis (last visited Feb. 23, 2026). It is typically caused by other conditions, including viral infections. *Id.*

[2] Defendants Gowdey, Kirkland, and Boes filed a motion to dismiss on November 14, 2023. Shortly thereafter, on December 5, 2023, Defendant Cardiovascular Institute of the South filed its motion to dismiss. Defendants Rush Medical Foundation d/b/a Rush Medical

trial court agreed with the motion and dismissed Plaintiffs' complaint. The trial court found that "the condition alleged in the [c]omplaint that [James] was ultimately diagnosed with was 'transverse myelitis caused by COVID-19,'" that James's "treatments occurred . . . during the COVID-19 state of emergency," and that James's "condition was caused directly or indirectly by the COVID-19 state of emergency during the COVID-19 state of emergency." The trial court concluded dismissal was proper since Plaintiffs' complaint "fail[ed] to state a claim upon which relief c[ould] be granted due to [Defendants'] immunity." Plaintiffs timely appealed.

¶6. On appeal, Plaintiffs argue the immunity provisions under Section 11-71-7 are inapplicable to the facts of this case and do not afford Defendants immunity from the lawsuit. Defendants disagree and argue they are immune from liability under Section 11-71-7. In support of their positions, both Plaintiffs and Defendants filed appellate briefs with the Court. An *amici curiae* brief was also filed by Mississippi Academy of Family Physicians, Mississippi Health Care Association, Mississippi Healthcare Collaborative, Mississippi Nurses Association, and Mississippi State Medical Association in support of Defendants' immunity under Section 11-71-7.

## STANDARD OF REVIEW

¶7. "A rule 12(b)(6) motion to dismiss tests the legal sufficiency of a claim. . . . Therefore, we review de novo the denial of a motion to dismiss for failure to state a claim." ***Spiers v. Oak Grove Credit, LLC***, 328 So. 3d 645, 652 (Miss. 2021) (alteration in original) (internal

Group, P.A., d/b/a Ocshner Rush, and Rush Medical Group, P.A., joined both motions.

4

quotation marks omitted) (quoting *Bowden v. Young*, 120 So. 3d 971, 975 (Miss. 2013)). "A motion to dismiss under the rule should not be granted unless, taking the factual allegations of the complaint as true, 'it appears beyond any reasonable doubt that the non movant can prove no set of facts in support of the claim which would entitle them to relief.'" *Id.* (internal quotation marks omitted) (quoting *Bowden*, 120 So. 3d at 975).

¶8.    "When a question of law is raised we apply a de novo standard of review." *Hankins v. Maryland Cas. Co./Zurich Am. Ins. Co.*, 101 So. 3d 645, 652 (Miss. 2012) (internal quotation mark omitted) (quoting *Corban v. United Servs. Auto. Ass'n*, 20 So. 3d 601, 609 (Miss. 2009)). Likewise, "[m]atters of statutory interpretation also are reviewed by this Court using a de novo standard." *HWCC-Tunica, Inc. v. Miss. Dep't of Revenue*, 296 So. 3d 668, 673 (Miss. 2020) (internal quotation marks omitted) (quoting *Chandler v. McKee*, 202 So. 3d 1269, 1271 (Miss. 2016)).

## DISCUSSION

¶9.    "This Court must apply the plain meaning of a statute in which the words are clear and unambiguous." *Foreman v. DHP1, LLC*, 406 So. 3d 763, 770 (Miss. 2025) (citing *Lawson v. Honeywell Int'l, Inc.*, 75 So. 3d 1024, 1027 (Miss. 2011)).

¶10.   Section 11-71-7 provides in applicable part as follows:

> (1) Any health care professional or health care facility shall be immune from suit for any injury or death directly or indirectly sustained because of the health care professional's or health care facility's acts or omissions while providing health care services related to a COVID-19 state of emergency. The immunity takes effect when the COVID-19 state of emergency is declared, applies to any health care services performed during the COVID-19 state of emergency, including any period of renewal or extension, and terminates one (1) year after the end of the COVID-19 state of emergency. The immunity

5

includes, but is not limited to, injury or death resulting from screening, assessing, diagnosing or treating persons in relation to the COVID-19 state of emergency or the medical conditions causing the COVID-19 state of emergency[.]

. . . .

(2) This chapter shall be liberally construed with regard to immunizing health care professionals or health care facilities for acts or omissions undertaken while providing health care services related to a COVID-19 state of emergency.

Miss. Code Ann. § 11-71-7 (Supp. 2025).

¶11.　"'COVID-19' means the novel coronavirus identified as SARS-CoV-2, the disease, health condition or threat caused by the novel coronavirus SARS-CoV-2, or a virus mutating therefrom, and conditions associated with the disease." Miss. Code Ann. § 11-71-3(a) (Supp. 2025).　"'COVID-19 State of Emergency' means . . . [a] state of emergency related to COVID-19 proclaimed by the Governor[.]" Miss. Code Ann. § 11-71-3(b)(iii) (Supp. 2025). "'Health care services' means any care, treatment, service, or procedure to maintain, diagnose or otherwise affect an individual's physical or mental condition." Miss. Code Ann. § 11-71-3(g) (Supp. 2025).

¶12.　Plaintiffs assert the main issue before the Court is the interpretation of the phrase "health care services related to the COVID-19 state of emergency." § 11-71-7(1). Plaintiffs claim Section 11-71-7(1)

does *not* state that immunity shall be afforded for the provision of healthcare services merely related to "COVID-19" or the treatment of medical conditions caused by "COVID-19" or for strictly *any* healthcare services performed during the COVID-19 state of emergency. [Instead,] [t]he statute explicitly goes further—it states that immunity shall be afforded for healthcare services related to the COVID-19 *state of emergency* and the treatment of medical

6

conditions which caused the COVID-19 *state of emergency*. But clearly, there would not have been a COVID-19 state of emergency but for COVID-19. Stated differently, COVID-19 *caused* the COVID-19 state of emergency. And immunity under Section 11-71-7(1) "applies to any health care services performed during the COVID-19 state of emergency" and "includes . . . treating persons in relation to the COVID-19 state of emergency or the medical conditions *causing* the COVID-19 state of emergency[.]" § 11-71-7(1) (emphasis added). Thus, the phrase "health care services related to the COVID-19 state of emergency" means healthcare services related to COVID-19 performed during the COVID-19 state of emergency.

¶13. Here, James's health condition, transverse myelitis, was admittedly caused by COVID-19. Indeed, in both their presuit notice letter and complaint, Plaintiffs acknowledged and admitted that James "was ultimately diagnosed with transverse myelitis caused by COVID-19[.]"[3] Clearly, if James's health condition was caused by COVID-19, then the healthcare services[4] provided by Defendants for James's COVID-19-induced health condition were related to COVID-19. And it is undisputed that the healthcare services provided by Defendants were performed during the COVID-19 state of emergency. Thus, based on the facts of this case and a plain reading of the statute, James's alleged injuries from

_____

[3] Because James's health condition was caused by COVID-19, it falls under the definition of COVID-19. *See* § 11-71-3(a) ("'COVID-19' means the novel coronavirus identified as SARS-CoV-2, the disease, health condition or threat caused by the novel coronavirus SARS-CoV-2, or a virus mutating therefrom, and conditions associated with the disease.").

[4] No one disputes that the services provided by Defendants were healthcare services under Section 11-71-3(g).

Defendants' treatment of his COVID-19-induced transverse myelitis were "directly or indirectly sustained . . . while [Defendants were] providing health care services related to a COVID-19 state of emergency." § 11-71-7(1). In other words, Plaintiffs' "injur[ies] . . . result[ed] from . . . treating persons in relation to the COVID-19 state of emergency or the medical conditions causing the COVID-19 state of emergency[.]" § 11-71-7(1). As a result, Defendants are immune from liability under Section 11-71-7.

¶14. In support of their argument that Section 11-71-7 is inapplicable, Plaintiffs rely on the Mississippi State Department of Health's COVID-19 System of Care Plan (Department of Health's Plan), which describes COVID-19 as follows:

> The disease, a respiratory virus, has the potential to cause severe respiratory presentations and injure the lungs. Since the outbreak began, significant numbers of COVID-19 positive patients have required supplemental oxygen and/or ventilators to support breathing. When death occurs, it is usually the result of respiratory pathology, which resembles Acute Respiratory Distress Syndrome, renal failure or multiple system organ failure. However, it may also be associated with exacerbation of comorbidities, i.e. cardiovascular disease, etc.

https://msdh.ms.gov/page/resources/8575.pdf (last visited Feb. 23, 2026).

¶15. According to Plaintiffs, the Department of Health's Plan "makes evident that medical conditions that caused the COVID-19 state of emergency entailed wide-spread acute respiratory distress and compromise in the face of waning critical care resources." Plaintiffs assert that based on the Governor's executive order as well as the Department of Health's Plan, Section 11-71-7(1) applies only to "the medical community's deliberate treatment of active COVID-19 infections and the emergency response activities related to or affected by the volume of COVID-19 cases." Plaintiffs claim that "[a]t no point during the medical

8

treatment at issue did the [D]efendants diagnose or attempt to treat [James] for an active

COVID-19 infection" or acute respiratory distress.

¶16.  But the *amici curiae* note:

> The plain language of the statute directly undermines [Plaintiffs'] attempt to narrowly construe its scope. The statute grants immunity for injury or death "directly or indirectly sustained" from acts or omissions while providing healthcare services "related to a COVID-19 state of emergency." It does not limit immunity to the treatment of an active COVID-19 infection or emergency response activities related to or affected by the volume of COVID-19 cases. [Plaintiffs'] Complaint alleged that his diagnosis was "transverse myelitis caused by COVID-19"—establishing a direct nexus between the medical condition at issue and COVID-19 (which is statutorily defined as encompassing conditions caused by and associated with the disease), the very virus that precipitated the "COVID-19 state of emergency." Treatment for a condition alleged to be caused by COVID-19, occurring during the declared state of emergency, falls squarely within healthcare services related to that emergency.

¶17.  Additionally, as Cardiovascular Institute of the South notes:

> Section 11-71-7 provides for immunity where medical services are related to "the state of emergency," and not just where they are related to the "state of emergency *response*." There is no basis in the statutory text for requiring services to be related to and in furtherance of the Department of Health's efforts and focus in response to the pandemic, and the statute does not provide that its provisions and terms are to be defined by, or interpreted according to, the [Department of Health's] Plan.
>
> . . . .
>
> Furthermore, the [P]laintiffs' argument that immunity is limited to treatment of active infections and severe respiratory distress is contrary to the plain wording of [S]ection 11-71-7. The statute provides immunity for "injury . . . resulting from . . . diagnosing or treating persons in relation to . . . the medical conditions causing the COVID-19 state of emergency." It is plain that COVID-19 is a medical condition that caused the state of emergency. The statute does not limit its definition of "COVID-19" to just severe respiratory disease that may result from infection but instead defines "COVID-19" broadly to include "the disease, health condition or threat caused by the [virus] . . . and

conditions associated with the disease." Miss Code Ann 11-71-3(a).

¶18.  Plaintiffs cite two extrajurisdictional cases in support of their argument that Section 11-71-7 is inapplicable and does not provide immunity to Defendants.  But Plaintiffs' reliance on these cases is misplaced because both cases are distinguishable.

¶19.  In *LP Louisville Herr Lane, LLC v. Buckaway*, 705 S.W.3d 31, 32 (Ky. Ct. App. 2024), the patient underwent back surgery in April 2020.  The patient was hospitalized for eleven days after surgery, during which she "received wound care and dressing changes pursuant to physician orders." *Id.*  The patient was then transferred from the hospital to a nursing home for continued post-surgical care. *Id.*  Approximately one month later, during a telehealth conference with the patient's surgeon, the nursing-home staff discovered that the patient's wound had become infected. *Id.*  The next day, the patient "was found unresponsive" and "was immediately transferred to the hospital where she was diagnosed with a catastrophic E.coli infection." *Id.*  The patient's estate filed a medical-malpractice wrongful-death lawsuit claiming that the defendant nursing home "failed to follow physician orders and instructions and that it otherwise neglected to provide her with basic nursing care during her stay." *Id.*

¶20.  Defendant moved for summary judgment based on Kentucky's COVID-19 immunity statute, which provided as follows:

> "[A]ny essential service provider during the declared emergency of the COVID-19 pandemic shall not be liable for any COVID-19 claim." [KRS 39A.275(8)(a)]. A "COVID-19 claim" is "any claim or cause of action for an act or omission arising from COVID-19." KRS 39A.275(1)(c). An injury "arises from COVID-19" where it was caused by "[s]ervices, treatment, or other action performed to limit or prevent the spread of COVID-19; or

10

[s]ervices performed by an entity outside the normal course of its business in response to COVID-19[.]" KRS 39A.275(1)(a). Immunity is not triggered under the statute unless a causal connection exists between the injury suffered and the action taken by the care provider. However, no immunity applies for an act or omission involving "gross negligence, or wanton, willful, malicious, or intentional misconduct."

*Id.* at 33-34 (third, fourth, and fifth alterations in original).

¶21. The trial court denied defendant's motion for summary judgment, and the Kentucky Court of Appeals affirmed. *Id.* at 33. In affirming, the appellate court noted:

[Defendant] submits that the telehealth conference of May 18 was a COVID-19 countermeasure undertaken to prevent or limit the spread of disease. It contends that the deterioration of [patient]'s surgical wound was caused by or resulted from the COVID-19 restriction that prevented both [patient]'s physician and a nurse practitioner from examining the patient in person.

[Patient]'s estate argues that her injuries were not caused by any action taken to limit or prevent the spread of COVID-19 or by services performed outside the normal course of [defendant]'s business in response to COVID-19. Instead, [patient]'s estate argues that during the time that she was in the care of [defendant], staff was neglectful and failed to provide her with appropriate care as directed by her doctor and failed to provide her such nursing and rehabilitation services as are customarily provided by the nursing home. The estate argues that there is no link between the use of a telehealth conference and [patient]'s infection and that, therefore, the causal connection required to assert the immunity provided by state and federal provisions has not been shown.

We agree with [patient]'s estate that the telehealth conference came too late to be a factor in causing [her] injuries. Evidence considered by the trial court indicated that by the time of the telehealth conference, [patient] had already suffered days—if not weeks—of neglect by nursing home staff. The wound infection was described by [patient]'s physician as very deep and "clearly caused by failure to keep the wound clean and change the dressing" as ordered. Another doctor confirmed that the wound had probably been infected for several days before the May 18 telehealth conference. Finally, the [defendant]'s director testified unequivocally that COVID-19 protocols did not prevent staff from caring properly for [patient]'s wound.

Neither the federal nor the state immunity statute created a new defense to standard negligence claims. The circuit court did not err by concluding that the ordinary negligence claims asserted by the [estate] fell outside the scope of both the PREP Act and Kentucky's immunity provision.

*Id.* at 34.

¶22.    In ***Resurgens, LLC v. Ervin***, 894 S.E.2d 408, 409 (Ga. Ct. App. 2023), the patient filed a medical-malpractice suit against his physician and the physician's employer for injuries sustained as a result of an elective back surgery performed in May 2020. The defendants moved to dismiss the complaint, citing immunity under Georgia Code Section 38-3-35(b), which provides as follows:

> (b) Neither the state nor any political subdivision of the state nor, except in cases of willful misconduct, gross negligence, or bad faith, the employees, agents, or representatives of the state or any political subdivision thereof, nor any volunteer or auxiliary emergency management worker or member of any agency engaged in any emergency management activity complying with or reasonably attempting to comply with Articles 1 through 3 of this chapter; or any order, rule, or regulation promulgated pursuant to Articles 1 through 3 of this chapter, or pursuant to any ordinance relating to precautionary measures enacted by any political provisions of Articles 1 through 3 of this chapter, or pursuant to any ordinance relating to precautionary measures enacted by any political subdivision of the state shall be liable for the death of or the injury to person or for damage to property as a result of any such activity.

Ga. Code Ann. § 38-3-35(b) (West, Westlaw through 2025 Reg. Sess. of Ga. Gen. Assemb.).

¶23.    Defendants argued "that [the defendant physician] was an 'auxiliary emergency management worker' and that the service and care provided to [the patient] constituted 'emergency management activities' as defined by executive orders issued by [the governor] . . . (after declaring a public health state of emergency in response to the COVID-19 pandemic)." ***Ervin***, 894 S.E.2d at 410. According to the defendants, "these orders and the

state law shielded them from liability for any injuries other than those caused by willful misconduct, gross negligence, or bad faith, which the [plaintiffs] had not alleged or proven through the submission of an expert affidavit." *Id.*

¶24.    The trial court denied the motion to dismiss, and the Georgia Court of Appeals affirmed. *Id.* at 414.  The appellate court stated:

> Essentially, the defendants are asking us to interpret the Executive Order as providing immunity to all healthcare activities performed by healthcare workers at healthcare institutions from April 14, 2020, until the implementation of the Pandemic Business Safety Act, regardless of whether the activities otherwise were related to the ongoing public health emergency. Our plain reading of the Executive Order — including its declarations, purpose, and intent (as expressed in its text) and the statutes it explicitly references, leads us to reject the defendants' sweeping interpretation. Thus, although [defendant physician] may have been an "auxiliary emergency management worker" under the Executive Order and OCGA § 38-3-35, unless he can show that he was also "engaged in any emergency management activity" when performing the actions that allegedly led to [patient]'s injuries, he is not automatically entitled to the protections outlined in the statute. The defendants do not cite to a compelling argument supported by the record — at least at this stage of the proceedings — that [defendant physician]'s performance of a surgery which both was: (1) elective (that is, non-emergency), and (2) apparently unrelated in any way to the COVID-19 public health emergency (save for taking place during the public health emergency's existence) — constituted an "emergency management activity" (defined in OCGA § 38-3-3 (2)).

*Id.* at 413.

¶25.    Neither *Buckaway* nor *Ervin* are applicable.  In *Buckaway*, the patient's back surgery and post-operative E-coli infection did not "aris[e] from COVID-19" nor was it "caused by . . . action performed to limit or prevent the spread of COVID-19[.]" *Buckaway*, 705 S.W.3d at 33-34.  Thus, the immunity statute did not apply. *Id.*  Likewise, in *Ervin*, the patient's elective back surgery was completely unrelated to COVID-19 except for the fact that the

surgery occurred "during the public health emergency's existence." *Ervin*, 894 S.E.2d at 413.

¶26.    Here, unlike in both *Buckaway* and *Ervin*, James asserts his health condition was caused by COVID-19.    And Defendants' treatment of the COVID-19-induced health condition was "related to" or "in relation to" the "COVID-19 state of emergency" and/or "the medical conditions causing the COVID-19 state of emergency." § 11-71-7(1). Thus, unlike in *Buckaway* and *Ervin*, the immunity provisions of Section 11-71-7(1) apply, and Defendants are immune from liability.

¶27.    In support of their argument against immunity, Plaintiffs also rely on statements from a legislative member, specifically Senator Sally Doty, to show legislative intent.  According to Plaintiffs, during the presentation of Senate Bill Number 3049,[5] Senator Doty made certain comments regarding her understanding of the scope of immunity.  Those comments, quoted verbatim from Plaintiffs' appellate brief, are as follows:

| Senator Doty: | [S.B. 3049 § 4] has a specific limitation of liability for *exposure* to COVID for healthcare professionals and healthcare facilities . . . . [S.B. 3049 § 4] provides a limitation of liability for acts or omissions in treating COVID related claims[.] |
|---|---|
| Senator Doty: | This is an immunity bill that is very limited in scope, very targeted[.] |
| Senator Doty: | [S.B. 3049 § 4] is—it's COVID related. So I mean, it is for *exposure* to COVID[.] |
| Senator Doty: | What this bill seeks to do is specifically look at COVID. That's all it's looking at; the *exposure* to COVID . . . this |

---

[5] Section 11-71-7 began as section 4 of Senate Bill Number 3049.

is specifically about *exposure* to COVID.

Senator Doty: This is specifically targeted to COVID claims and exposure to COVID. Very limited in scope.

. . . .

Senator McDaniel: I just want to be clear here. I want a clarification from you. You're not trying to provide blanket immunity to anyone are you?

Senator Doty: No, this is a very specific and targeted immunity for exposure to COVID claims, for COVID, for contraction to the COVID virus, and also to provide some limitation of liability for healthcare workers as they are treating COVID cases.

¶28. Plaintiffs claim the senator's comments "clarify the intent and meaning of [Section 11-71-7(1)]." Plaintiffs suggest the Court consider the senator's comments to discern the legislative intent, and they argue the senator's comments establish that the Legislature did not intend for Section 11-71-7(1) to provide immunity to Defendants in this case. But Plaintiffs' position regarding legislative intent is procedurally barred.

¶29. It is undisputed that Plaintiffs failed to present this argument to the trial court. "This Court repeatedly has held that an issue not raised before the lower court is deemed waived and is procedurally barred." *Brown v. Miss. Dep't of Emp. Sec.*, 29 So. 3d 766, 771 (Miss. 2010) (citing *Pub. Emps.' Ret. Sys. v. Freeman*, 868 So. 2d 327, 330 (Miss. 2004)). Because Plaintiffs did not raise the issue of legislative intent before the trial court, it is waived and procedurally barred. *Id.* (citing *Freeman*, 868 So. 2d at 330).

## CONCLUSION

¶30. The immunity provisions under Section 11-71-7(1) are applicable to the facts of this

case, and Defendants are immune from liability under Section 11-71-7(1). "[T]aking the factual allegations of the complaint as true, 'it appears beyond any reasonable doubt that the [Plaintiffs] can prove no set of facts in support of the claim which would entitle them to relief.'" *Spiers*, 328 So. 3d at 652 (internal quotation marks omitted) (quoting *Bowden*, 120 So. 3d at 975). As a result, the trial court did not err by dismissing Plaintiffs' complaint. The trial court's orders of dismissal are affirmed.

¶31. **AFFIRMED.**

**RANDOLPH, C.J., ISHEE AND SULLIVAN, JJ., CONCUR. COLEMAN, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY RANDOLPH, C.J., ISHEE, GRIFFIS AND SULLIVAN, JJ. KING, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. BRANNING, J., NOT PARTICIPATING.**

**COLEMAN, PRESIDING JUSTICE, SPECIALLY CONCURRING:**

¶32. I concur with the majority's holding and reasoning. I write the instant separate opinion to discuss an additional reason that the Court should not give weight to arguments based on legislative history such as the one raised for the first time on appeal by the plaintiff here.

¶33. Although I disagree that Plaintiffs' legislative-history argument should be considered waived, for another reason I agree with the majority's decision to disregard it. Legislative history should play no role in the Court's *de novo* review of statutory meaning.

¶34. Mississippi's Constitution prescribes the manner in which the Legislature generates the laws of our State.

> Bills may originate in either House, and be amended or rejected in the other, and every bill shall be read by its title on three (3) different days in each

16

House, unless two-thirds ( 2/3 ) of the house where the same is pending shall dispense with the rules; and every bill shall be read in full immediately before the vote on its final passage upon the demand of any member; and every bill, having passed both Houses, shall be signed by the President of the Senate and the Speaker of the House of Representatives during the legislative session.

Miss. Const. art. 4, § 59. After passage by the Legislature, the bill is sent to the governor who may sign it, veto it, or return it unsigned to the Legislature. Miss. Const. art. 4, § 72. Nothing in the constitutionally prescribed process gives even persuasive force, much less the force of law, to comments made by legislators, whether in the legislative chambers or out, whether in support of or against a bill, as to be given deference by the Supreme Court as we conduct our duty to interpret statutes.

¶35.    The interpretation of statutes in the context of litigation is the sole province of the courts. *King v. Miss. Mil. Dep't*, 245 So. 3d 404, 407-08 (¶¶ 10-12) (Miss. 2018). The Courts do not share that responsibility with state agencies, *id.*, or municipal authorities. *Wheelan v. City of Gautier*, 332 So. 3d 851, 856-59 (¶¶ 17-19) (Miss. 2022). There is no reason for the Court to share its authority with individual legislators who, before the bill becomes law, make public remarks expounding on it. It goes without saying that such remarks have not gone through the constitutionally prescribed process of becoming part of the law, and elected legislators could have all manner of reasons to make public remarks regarding a bill that do not line up with the effect of the bill as found in its text.

**RANDOLPH, C.J., ISHEE, GRIFFIS AND SULLIVAN, JJ., JOIN THIS OPINION IN PART.**

17